IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| RICHARD L. PHILLIPS, | : | |
| | : | Case No. 1:05CV485 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| TRADESMEN INTERNATIONAL, | : | AND DENYING IN PART |
| Inc., | : | MOTION FOR SUMMARY |
| | : | JUDGMENT |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 14.)  Plaintiff Richard L. Phillips filed a complaint asserting that his former employer, Defendant Tradesmen International, Inc. ("Tradesmen"), is liable to him for discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (the "ADEA") and Ohio Revised Code §§ 4112.14 and 4112.99,[1] and for wrongful discharge in violation of Ohio public policy.  (Doc. 1.)  Tradesmen moved for summary judgment as to all of Phillips' claims.  (Doc. 14.)  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's motion.  The Court grants the motion as it relates to Phillips' Ohio public policy claim but denies the motion as it relates to Phillips' statutory age discrimination claims.

**I. BACKGROUND**

---

[1] Chapter 4112 actually offers four alternative means of promoting the public policy against age discrimination: R.C. §§ 4112.02(N), 4112.08, 4112.14, and 4112.99.  Section 4112.99 provides a blanket cause of action for any violation of Chapter 4112.  Thus, in this case, Phillips brings his claim under § 4112.99, but premises the claim on a violation of § 4112.14.

Plaintiff Phillips worked for Defendant Tradesmen for just over one year. Tradesmen hired Phillips as a Project Coordinator for the Cincinnati office on August 1, 2003 and terminated him the following year on November 1, 2004.[2] (Doc. 14 at 1; doc 17 at 1.) At the time of his termination, Phillips was 42. He contends that Tradesmen terminated him as part of a sweeping effort to replace older employees with a younger workforce. Defendant responds that it decided to terminate Phillips based on repeated complaints about Phillips' performance, not because of his age.

Tradesmen is a construction labor company that hires skilled laborers such as electricians, plumbers, and carpenters and then leases the services of these workers on a short-term basis to contractors engaged in the construction business. The company operates facilities across the United States, including in the Southern District of Ohio, where it has field offices in Columbus, Dayton, and Cincinnati. Each Southern Ohio field office is staffed with a Manager, a Project Coordinator (previously called "Recruiters"), an Administrative Assistant, and a crew of Sales Representatives. (Marko Aff. ¶ 4, June 29, 2006.)

The local Manager at each field office oversees routine business operations and directly supervises the remaining office staff. (Murray Dep. 6, Feb. 23, 2006.) The Administrative Assistant handles the majority of the administrative tasks within the office, including receptionist

---

[2] Phillips actually started as a Recruiter. However, in September 2004, just prior to Phillips' termination, Tradesmen instituted a company-wide title change, renaming the Recruiter position as the Project Coordinator position. (Cook Aff. 1 ¶ 4, Aug. 24, 2006; doc. 14 at 2 n. 2.) The company maintains that this change was limited to the job title with no effect on the position's material responsibilities or compensation. (*Id*.) However, Phillips contends that he understood the change to be a promotion and that even though his compensation and job responsibilities remained the same, some project coordinators received a raise in conjunction with a similar title change in the past. (Doc. 27 at 12-13.)

duties, processing payroll, and maintaining files on personnel and clients. (Phillips Dep. Ex. 7 ¶ 11.6, Feb. 7, 2006.) Sales responsibilities fall primarily on the Sales Representatives.[3] Each representative markets the company's services within his or her assigned geographic territory, soliciting construction contractors to register as clients. (Seeberg Dep. 6, April 20, 2006.) The Sales Representatives also act as liaisons between the clients and the company, securing work orders and placing laborers at client job sites. (*Id*.)

Finally, the Project Coordinator is in charge of recruiting, interviewing, evaluating, and hiring the skilled laborers who make up Tradesmen's work force. In this role, the Project Coordinator interacts regularly with the Administrative Assistant and the Sales Representatives. For example, the interview process that the Project Coordinator administers for each applicant involves a significant amount of paperwork. Each time the Project Coordinator hires a new laborer, he must forward all of the paperwork generated during the interview to the Administrative Assistant, who then processes the paperwork for payroll and billing purposes. (Wettschurack Dep. Ex. 5, Feb. 22, 2006; Waggoner Dep. 95-101, Feb. 22, 2006; Zimmerman Dep. 46, April 27, 2006.)

The Project Coordinator also works closely with the Sales Representatives during daily operations meetings in order to fill client work orders. However, the parties dispute the precise responsibility that each employee has for placing laborers with Tradesmen's clients. According to Tradesmen, the Sales Representatives inform the Project Coordinator of the skill requirements identified by the clients and rely entirely on the Project Coordinator's evaluative skills and

---

[3] The parties occasionally refer to the Sales Representatives as Field Representatives. There appears from the record to be no significant difference between the two.

3

discretion to determine which laborers would best serve the needs of each client. (Murray Dep. 9, 28-29; Waggoner Dep. 82-83, 90-94; Seeberg Dep. 68-69.) In contrast, Phillips, who worked as a Project Coordinator in the Cincinnati office, alleges that while he provided candidates for the representatives to select from, the representatives often independently reviewed the candidates' qualifications to determine which candidate would be a good fit for a particular client. Phillips also alleges that while he discussed the skills and qualifications of each candidate with the Sales Representatives, the representatives had the final call on which laborers they would assign to each job site. (Waggoner Dep. 95-96; Phillips Aff. ¶ 3, Aug. 10, 2006.)

During Phillips' employment with Tradesmen, the chain of command at the company was as follows: Joseph Wesley served as the company's President and CEO. Next in line was the Regional Vice President, George Brophy. Answering to Brophy and overseeing the operations of the Southern Ohio field offices was the District General Manager. Jeff Moore held this position during most of the year that Phillips worked for the company. However, on September 27, 2004, Brophy terminated Moore. Shortly thereafter, on October 1, 2004, Wesley promoted Kevin Wettschurack, who had served in a sales manager capacity for the company's Indianapolis district, to the District General Manager position for the Southern Ohio region. (Doc. 14-1 at ¶ 9; doc. 17-2 at ¶ 9.)

Accordingly, Jeff Moore served as Phillip's supervisor until Tradesmen terminated him on September 27, 2004. Plaintiff Phillips claims that prior to Moore's termination, both Brophy and Wesley expressed intentions to reshape the company by replacing older employees with younger employees. (Doc. 17 at 3; doc. 17-2 at 6; Moore Dep. 61, 65, 68, April 21, 2006; Moore Aff. ¶¶ 3, 4, 6, 7; Phillips Dep. 110, 231-32, 240, Feb. 7, 2006.) Phillips relies mainly on

4

Moore's deposition testimony and affidavit to support this allegation.  For example, Moore testified that Brophy made comments to him such as "We need to look at our most successful offices and the youth and exuberation.  There's a different feel to the offices.  They're younger." (Moore Dep. 68.)  Moore attributed similar comments to President and CEO Wesley, claiming that during a General Managers' meeting Wesley stated that "employees over 40 didn't fit in" and that the managers needed to look at the company's "most successful offices . . . where there were young, energetic employees."  (Moore Aff. ¶ 7.)  Moore further testified that Brophy directed Moore to fire Phillips along with several other employees because of their ages and the need to "clear out the old wood." (*Id.* ¶¶ 4, 6.)[4]  Ultimately, according to Plaintiff, Brophy terminated Moore in September 2004 because he refused to comply with Brophy's plans to terminate older employees.[5]  (Doc. 17 at 5-6; Phillips Dep. 262.)  Phillips' termination followed shortly thereafter.

The parties agree that Wettschurack, who assumed Moore's General Manager position in October 2004, is the individual who officially terminated Phillips, though they dispute the role that Brophy played in Phillips' termination.  According to Defendant, Wettschurack made the decision independently after meeting Phillips and speaking with his coworkers.  (Wettschurack Dep. 35, 64; Brophy Dep. 71, Feb. 23, 2006.)  Specifically, Defendant Tradesmen claims that

---

[4] The other employees whom Brophy allegedly ordered Moore to fire included: (1) Donald Doerr, a Cincinnati Sales Representative who was in his early 50s; (2) Marsha Zimmerman, the Cincinnati Administrative Assistant, who was in her late 50s; and (3) Beth Zimmer, the Project Coordinator for the Dayton office, who like Phillips was in her early 40s.

[5] Following his termination, Moore sued Tradesmen in the Hamilton County Court of Common Pleas, alleging that Brophy unlawfully terminated him due to his refusal to fire older employees.

several employees expressed dissatisfaction with Phillips. For example, Cincinnati Sales Representatives Austin Waggoner and Jeff Keller complained that Phillips was rude, abrasive, and unprofessional. (Wettschurack Dep. 57-59; Waggoner Dep. 69-70.) They additionally expressed concern that Phillips did not adequately screen the laborers who he hired and both threatened to quit if the situation with Phillips was not resolved. (Waggoner Dep. 54-60; Wettschurack Dep. 97-100.)

The Dayton Project Coordinator, Beth Zimmer, also complained to Wettschurack about Phillips, stating that she did not like the way Phillips conducted business and did not feel comfortable with the people Phillips hired. (Wettschurack Dep. 59.) In fact, Zimmer testified that Phillips so negatively affected the morale of the Cincinnati office that she avoided going there unless ordered to so. (Zimmer Aff. ¶ 6, June 27, 2006.) When Brophy asked Zimmer what changes the company could institute to improve the Cincinnati office, she replied that "if Kevin Wettschurack wanted things to improve, he should get rid of Phillips because he was unbearable." (Zimmer Aff. ¶ 7.)

Cincinnati Administrative Assistant Marcia Zimmerman also reported problems with Phillips, citing primarily his use of vulgarity in the workplace, his submission of untimely and incomplete paperwork for the laborers he hired, and his overall demeanor. (Zimmerman Dep. 50-56, April 27, 2006.) Like Zimmer, Zimmerman advised Brophy that in order to "straighten out the Cincinnati office" he would need to "fire Rick Phillips." (Zimmerman Dep. 98.)

Aside from the general complaints about Phillips' performance, Wettschurack also learned of two occasions upon which Phillips failure to supply competent laborers to various jobsites injured the company's client relations. Scott Seeberg, a Dayton Sales Representative,

6

reported the first incident. According to Seeberg, one client became so dissatisfied with the pool of laborers coming from the Cincinnati office that it requested to work with laborers from the Dayton office and avoid the Cincinnati office. (Seeberg Dep. 31-32, 37-41.) With regard to the second incident, Waggoner reported that another client became so dissatisfied with the carpenters who Phillips dispatched to its jobsites that it ceased doing business with Tradesmen. (Waggoner Dep. 54-60, Feb. 22, 2006.)

Finally, Defendant claims that several laborers or "field employees" also lodged complaints that Phillips promised them raises and other perks which they never received. (Wettschurack Dep. 69-70.)

Defendant Tradesmen further contends that upon meeting Phillips, Wettschurack witnessed his abrasive and confrontational manner first hand. (*Id*. at 36-37.) According to Tradesmen, during Wettschurack's first day in Cincinnati, he observed Phillips barking orders at the Sales Representatives and immediately asked Brophy to identify him as he did not know Phillips by sight. (*Id*. at 36-37, 64.) Over the next few weeks, Wettschurack sat in on approximately 5 or 6 operations meetings and described Phillips behavior at these meetings as loud, confrontational, and intimidating. (Wettschurack Dep. 99.)

Wettschurack described these observations to Brophy when they met in mid-October 2004 to discuss Wettschurack's 2004 business plan. At that meeting, Wettschurack informed Brophy that he planned to fire Phillips and that he was considering a former Cincinnati Sales Representative, Chris Murray, as Philip's replacement. (Wettschurack Dep. 30-31, 36-37.) Murray had resigned earlier that year, at the time citing his dislike of Moore as one of the reasons he was leaving. He told another employee Dave Handerson, to call him when Moore

7

was gone. (Murray Dep. 11, 74, 88.) Henderson and Keller eventually recommended Murray to Wettschurack. (Wettschurack Dep. 40.) At the time that Murray took over Phillips' position he was in his late 20s. (Doc. 1 at ¶ 11.)

Phillips paints a very different picture of the events leading to his termination. First, Phillips claims that Wettschurack had so little contact with him prior to his termination that Wettschurack could not had adequately evaluated his performance, and that it was actually Brophy rather than Wettschurack who made the decision to terminate him. In fact, Phillips argues that Brophy ordered Wettschurack to terminate Phillips in early October before Wettschurack had ever met Phillips. In support of this allegation, Phillips points specifically to a document titled "Kevin Wettschurak, Game Plan 10-20/12-31," which Phillips alleges Brophy drafted based on notes from a meeting that occurred on or about October 3-4, 2004. (Brophy Dep. 35, Feb. 23, 2006.)[6] As one of the goals identified for the Cincinnati Office, the document states "Replace PC [Project Coordinator] with solid person who can grow into OPJ Manager." (Brophy Dep. Ex. 2 at 1.)

Second, Phillips' denies Tradesmen's allegations that his performance and employee relations skills were lacking. Responding to these allegations, Phillips claims that mere weeks before his termination President and CEO Wesley told him that he was doing a good job. (Phillips Dep. 118.) To further refute Defendant's allegations, Phillips points to Moore's testimony that Phillips "did an excellent job in recruiting, finding employees," and filling orders.

---

[6] Defendant responds that Brophy did not actually draft the "Game Plan" until mid-October, after he had several meetings with Wettschurack and after Wettschurack had met Phillips and decided to fire him. (Doc. 20 at 11-12; Wettschurack Dep. 36-37, Feb. 22, 2006; Brophy Dep. 43-44.)

(Moore Dep. 22, 28.)  Moore also noted that Phillips took extra workplace safety training and required similar training of his employees in an effort to combat rising workers' compensation costs at the company.  (*Id*. at 24.)  The only criticism that Moore voiced was that from time to time Phillips made mistakes or omissions in completing the necessary paperwork for new employees.  (*Id*. at 28, 48-49.)

With regard to the alleged conflicts between he and his coworkers, Phillips admits to having had occasional problems with Zimmerman, but claims he got along well with the others and was unaware of any problems.  Moore similarly testified that he did not recall receiving any complaints about Phillips' from any of his coworkers, with the exception of Zimmerman, or from any clients of the company.  (*Id*. at 49-53.)

Phillips claims that before Brophy terminated Moore he told Moore to start looking for a new Recruiter and mentioned hiring a "kid" like Chris Murray.  (*Id*. at 65; Moore Aff. ¶5.)  Another employee of the Cincinnati office, David Brodt, testified that Brophy had threatened to replace the Cincinnati Sales Representatives with younger personnel and had made comments that Phillips was too old.  (Brodt Dep. 14, 23-25, April 21, 2006.)  Brophy then ordered Moore to manufacture documentation of performance problems so that the company would have evidence to support Phillips' termination.  (Moore Dep. 61, 64; Moore Aff. ¶¶ 4-5.)  For example, Brophy directed Moore to prepare a performance review documenting criticisms of Phillips' work and setting forth an action plan for improvement.  (Moore Dep. 63; Moore Aff. ¶ 4-5.)  Moore drafted the review, but never gave it to Phillips because he did not believe it was warranted.  (Moore Aff. ¶ 4.)  Phillips also claims that Brophy ordered Moore to require Zimmer to travel to

Cincinnati to provide additional training for Phillips so that she could act as a witness in support of his termination.[7] (Moore Dep. 61, 64; Moore Aff. ¶¶ 4-5.)

Finally, Phillips notes that he was not the only target of Brophy's alleged campaign to rid the company of older employees. He cites, for example, the company's treatment of Donald Doerr and Fred Hillard. According to Phillips, Tradesmen bypassed Doerr for a promotion three times, leading Doerr to resign in June 2005. Doerr stated in his June 7, 2005 letter of resignation that "he was in the midst of a youth movement," and did not "fit George Brophy's profile." (Doerr Dep. 9-12, Ex. 2, April 20, 2006.) Unlike Doerr, Hillard is still employed by Tradesmen, though Brophy twice demoted the 55 year-old employee in 2005. Phillips claims that prior to these demotions, in 2004, Brophy commented to Hillard, "Fred, you're one of the old timers and, you know, nobody can figure out why – how come you're still with the company." (Hillard Dep. 5-9, 19-21, April 20, 2006.) Though these instances are unrelated to Phillips' termination, Phillips argues that they are evidence of Tradesmen's general scheme to replace older employees with a more youthful workforce.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn

---

[7] Defendant denies this allegation and asks the Court to strike Moore's testimony on the basis that it conflicts with earlier sworn testimony. Defendant points specifically to statements that Moore gave regarding Zimmer's visit during an earlier deposition that took place on August 22, 2005. At that time, Moore stated that he was responsible for directing Zimmer to provide additional training to Phillips. (Moore Dep. 302-03, Aug. 22, 2005.)

therefrom, must be read in the light most favorable to the party opposing the motion.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law."  *Id.* at 252.

### III. ANALYSIS

**A.    Moore's 2006 Deposition Testimony and Affidavit**

As an initial matter, Defendant Tradesmen moves the Court to strike testimony from Moore's 2006 deposition and affidavit, arguing that this testimony directly conflicts with earlier sworn testimony that Moore gave in connection with his suit against Tradesmen.  Plaintiff responds that the later testimony merely supplements Moore's 2005 deposition testimony.

Regarding the admissibility of contradictory testimony at the summary judgment state, the general rule is that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say,

11

filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907-08 (6th Cir. 2006) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)); *see also Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) ("[A] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony.").  The Sixth Circuit elaborated on this "Contradictory Affidavit" rule in *Aerel,* 448 F.3d at 908, stating:

> These rules invariably reflect the importance of distinguishing legitimate efforts to supplement the summary judgment record from attempts to create a sham issue of material fact. . . . [A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony.  A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction.  If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue.

(internal citations and quotation marks omitted).

Applying the above standard, the *Aerel* court suggested that the district court erred in striking portions of an affidavit that "did not directly contradict [the affiant's] deposition testimony, but rather revealed information that was not fully explored during that testimony."  *Id*. at 909.  The court further noted that the exclusion of directly contradictory testimony

> is a far cry, however, from preventing a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage. Because the deponent is under no obligation to volunteer information not fairly sought by the questioner, we see no reason to apply [the Contradictory Affidavit rule] to such a situation.

*Id*. at 907.

In this case, Defendant claims that certain portions of Moore's 2006 deposition testimony and affidavit directly contradict his 2005 deposition testimony.  The Court turns first to Moore's statement in his affidavit regarding the allegedly false performance review.  (Moore Aff. ¶ 4.) Defendant claims that this contradicts Moore's 2005 deposition because during that deposition Moore was questioned about a Performance Improvement Plan for Phillips and stated nothing about believing the plan to be false.  (Moore Dep. 301-03, Aug. 22, 2005.)  Contrary to Defendant's assertion, the testimony is not contradictory.  The questioning related to the Performance Improvement Plan during Moore's 2005 deposition focused exclusively on the steps that Moore took to address Brophy's concerns about Phillips and improve Phillips' training.  Defendant did not question Moore regarding his opinion of the veracity of the performance plan or of Brophy's concerns about Phillips.  Moreover, it is entirely unclear from the evidence presently before the Court whether the Performance Improvement Plan referenced in the 2005 deposition is the same performance review discussed in Moore's 2006 affidavit.  To the contrary, these appear to be different documents.  Accordingly, the Court will not strike Moore's testimony on this matter.

Moore additionally states in his 2006 affidavit that Brophy ordered him to require Zimmer to provide additional training for Phillips and that "the true purpose of this training was to provide a witness and support for termination."  (Moore Aff. ¶ 5.)  In contrast to the previous affidavit statement, this statement does contradict Moore's earlier testimony.  In 2005, Moore was specifically asked, "what role did Brophy have in securing the training of Stornelli and Zimmer [for Phillips]," and he responded, "I have no clue.  I don't think – *he didn't have*

13

*anything to do with Beth Zimmer coming down*." (Moore Dep. 302, Aug. 22, 2005 (emphasis added).) The Court therefore strikes those portions of Moore's 2006 affidavit and deposition testimony in which Moore claims that Brophy requested that Zimmer come to Cincinnati to provide training for Phillips.

Defendant next argues that the Court should also strike all testimony regarding and age-related comments Brophy allegedly made about Phillips and all testimony that Brophy ordered Moore to terminate Phillips, arguing that Moore had opportunity to testify as to these matters during his 2005 deposition and failed to do so. Reviewing Moore's 2005 deposition, the Court finds that when asked the extremely broad question of whether Brophy made any ageist comments regarding anyone other than Cantrell, Zimmer, and Doerr, Moore simply replied, "Not that I can recall at this point." (Moore Dep. 182, Aug. 22, 2005.) Moore's subsequent testimony is not plainly contradictory. First, the deposition testimony that Moore gave in 2005 related to his own lawsuit and the questioning focused in large part on conversations that Moore had with Brophy about Doerr, Zimmer, and another employee, Beverly Cantrell. Defendant never questioned Moore directly about Phillips, except in the context of discussing Phillips' training. Moreover, Moore never testified during the 2005 deposition that Brophy did not order him to begin documenting criticisms of Phillips' performance or to terminate Phillips. While Moore's failure to address Phillips' termination in his 2005 deposition may call into question his credibility, this is ultimately a question for a jury, and the Court finds it would be inappropriate at this time to strike Moore's 2006 deposition testimony and affidavit statements about Brophy's role in Phillip's termination. *See Briggs v. Potter*, --- F.3d ----, 2006 WL 2641971, at *5 (6th Cir. Sept. 15, 2006) (reiterating that credibility determinations and the weighing of evidence are

14

functions reserved for the jury and holding that a district court erred in striking portions of an affidavit that allegedly contradicted the affiant's earlier deposition testimony where the district court impermissibly weighed the credibility of the affiant's statements).

## B.     Statutory Age Discrimination Claims

Having dealt with the preliminary evidentiary issue the Court turns now to the merits of Plaintiff's claims.  Phillips alleges that Tradesmen discriminated against him based on his age and terminated him in violation of the ADEA and Ohio Rev. Code §§ 4112.14 and 4112.99. Because Ohio Rev. Code Chapter 4112 parallels the federal discrimination statutes, the Court analyzes Phillips' age discrimination claim under the ADEA.  *See Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F.Supp.2d 787, 792 (S.D. Ohio 2002); *Plumbers and Steam Fitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 196 (1981).

As discussed above, Plaintiff claims that Tradesmen terminated him due to his age and accuses the company of carrying out a scheme to purge the company of its older employees.  In its Motion for Summary Judgment, Tradesmen argues that Plaintiff can show no evidence of discriminatory intent and asserts that it terminated Phillips because of his poor job performance. Phillips counters that Tradesmen can point to no evidence documenting the alleged performance problems and claims that they amount to pretext to cover the true reason for Phillip's termination – that the company was interested in hiring someone younger.

The ADEA prohibits an employer from refusing to "hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a). To establish a claim under the ADEA, a plaintiff-employee must show that "the protected trait

15

(under the ADEA, age) actually motivated the employer's decision"--that is, the employee's protected trait must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). Such a claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect, burden-shifting approach articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[8]

Where a plaintiff shows no direct evidence of discrimination, he must proceed under the *McDonnell Douglas* framework. The plaintiff must first make a prima facie showing on the age discrimination claim.[9] *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 547 (6th Cir. 2004). If the plaintiff makes such a showing, the burden shifts to the employer to show a nondiscriminatory reason for its employment decision. *Id.* (citing *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir.1993)) If the employer satisfies this burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's

---

[8] The Supreme Court has assumed that the *McDonnell Douglas* burden-shifting framework applies to age-discrimination cases. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996).

[9] To establish a prima facie case of age discrimination in relation to a termination of employment, a plaintiff must show (1) that he was a member of a protected age class; (2) that he was discharged; (3) that he was qualified for the position he held; and (4) that he was replaced by a younger worker or was treated differently than similarly situated younger employees. *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (citing *Cox v. DOT*, 53 F.3d 146, 150 (6th Cir. 1995)); *Cichewicz v. UNOVA Indus. Automotive Sys., Inc.*, No. 02-1831, 2004 WL 291178, at *2 (6th Cir. Feb. 12, 2004). For the purposes of its Motion for Summary Judgment, Defendant in this case concedes that Phillips presents enough evidence to establish a prima facie case of discrimination.

proffered reason was not its true reason but was, in fact, a pretext for decisions actually motivated by unlawful bias against age.  *Id.*

       1.      Direct Evidence of Discrimination

      Direct evidence of discrimination is rarely seen in the courts.  *See Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997) ("It is the rare situation when direct evidence of discrimination is readily available.").  It is the type of evidence that, if believed, "proves the existence of a fact without requiring any inferences."  *Rowan*, 360 F.3d at 548.  For example, an employer's statement to an employee that "I fired you because you are [old]" would qualify as direct evidence.  *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

      Phillips offers no such evidence with regard to Wettschurack.  However, Phillips' claims that several of Brophy's alleged statements amount to direct evidence of discrimination.  Phillips points specifically to Brophy's instruction to Moore to terminate Phillips because Phillips was "old wood."  Though this statement provides strong circumstantial evidence of discrimination, it is not direct evidence.  Moore did not terminate Phillips and though Phillips presents evidence suggesting Brophy made the ultimate decision to let him go, that evidence is also circumstantial rather than direct.[10]  Therefore, to conclude from the above statement that Tradesmen fired Phillips because of his age, one must first infer that Brophy was the ultimate decisionmaker and gave the same instruction to Wettschurack.  Because it requires an inference, such a statement is

---

     [10] Defendant argues that the evidence currently before the Court does not support the Plaintiff's assertion that Brophy drafted the "Game Plan" identifying Phillips' termination as one of Wettschurack's goals prior to Wettschurack meeting Phillips.  Indeed, the deposition testimony of both Brophy and Wettschurack indicates that Brophy did not draft the "Game Plan" until mid-October, after Wettschurack had met Phillips.  (Doc. 20 at 11-12; Wettschurack Dep. 36-37; Brophy Dep. 43-44.)  Plaintiff provides no evidence to contradict this testimony.  Nonetheless, Plaintiff points to sufficient additional evidence suggesting that Brophy played more of a role in Phillips' termination than Defendant describes.

not direct evidence. *See Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) ("Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. . . . It does not require the fact finder to *draw any inferences* to reach that conclusion." (internal citations and quotation marks omitted) (emphasis added)).

The remaining comments that Plaintiff cites as direct evidence require similar inferences. For example, Phillips points to Brophy's instruction to Moore to replace Phillips with a "kid" like Chris Murray and to Brophy's general comments about modeling the Cincinnati office after the more successful and youthful offices. For the same reasons discussed above, these statements may create an inference of discrimination, but they do not *require* the factfinder to conclude that discrimination was a motivating factor in Phillips' termination. Accordingly, Plaintiff Phillips presents no direct evidence of discrimination.

2.    *McDonnell Douglas* Framework

The absence of direct evidence does not foreclose Plaintiff's suit. Indeed, for the reasons discussed below, the Court finds that Phillips presents sufficient evidence of discrimination to prevail under the *McDonnell Douglas* framework. Solely for the purposes of its Motion for Summary Judgment, Tradesmen concedes that Phillips can establish a prima facie case of discrimination. This concession shifts the burden of proof to Tradesmen to "articulate some legitimate, nondiscriminatory reason for" Phillips' discharge. *McDonnell Douglas Corp.*, 411 U.S. at 802. Tradesmen satisfied this burden by explaining that it terminated Phillips due to his poor job performance and the problems that he had with other Tradesmen employees. The burden thus returns to Phillips to prove by a preponderance of the evidence "that the legitimate

18

reasons offered by [Defendant] were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). He may refute Defendant's proffered reasons by showing that they "(1) ha[ve] no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) w[ere] insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

Phillips does not allege that Defendant's proffered reasons for terminating him are in fact false. Instead, Phillips argues that his alleged performance problems were insufficient to warrant his discharge and did not actually motivate Defendant's decision to fire him.

Turning first to the sufficiency of Tradesmen's proffered reasons for firing him, Phillips challenges the following alleged bases for his termination: (1) Scott Seeberg's report to Wettschurak that one of the company's largest client's in the Southern Ohio region complained about the poor quality of workers dispatched from the Cincinnati office; (2) Wettschurack's personal observations of Phillips' behavior; and (3) the complaints from Sales Representatives Jim Keller and Austin Waggoner, Project Coordinator Beth Zimmer, Administrative Assistant Marsha Zimmerman, and unnamed laborers or field employees.

With regard to Scott Seeberg's report, Phillips claims that despite the client's complaints about the quality of workers who Phillips hired, Seeberg testified that Phillips did the best he could to provide him with workers and that sooner or later they always encountered problems finding qualified employees. Phillips does not, however, deny that the client eventually told Seeberg that he did not want to work with the Cincinnati office. Instead, Phillips simply argues that the client's complaints were not significant. In determining whether these complaints were insufficient to warrant Plaintiff's termination, the Court must not "focus on the soundness of an

19

employer's business judgment." *Chappell v. GTE Products Corp.*, 803 F.2d 261, 266 (6th Cir. 1986). In other words, Phillips must do more than argue that the client's complaints were not as significant as Defendant claims them to be. This Court will not question Defendant's determination that a client's request to cease working with laborers from the Cincinnati office reflects poorly on the individual responsible for hiring those laborers.

As to Waggoner's report that another client ceased doing business with the company due to its dissatisfaction with the workers that Phillips hired, Phillips maintains that he never received any complaints about the workers. He further claims that he referred only qualified tradesmen to the client. Yet, at the same time, he admits that some of the employees he referred had attendance problems or lacked carpentry skills, but suggests that these problems were not his fault because at that time there was a scarcity of qualified carpenters available to meet the client's needs. (Doc. 17 at 19.) In doing so, Phillips glosses over the fact that part of his job was to recruit qualified employees and therefore was ultimately responsible for any shortage in employees.

Turning next to his allegedly abrasive behavior, Phillips argues that other employees were similarly abrasive and yet were not terminated. Accordingly, Phillips argues that this is not a valid basis for his termination. Though evidence shows that other employees, including Zimmer and Zimmerman, at times engaged in abrasive behavior (Seeberg Dep. 51, 59; Moore Dep. 45; Doerr Dep. 18-19, 22), there is no evidence that Wettschurack or any other manager witnessed this behavior. Nor is there evidence that Wettschurack received complaints about any employees other than Phillips. Were Wettschurack's observation of Phillips' abrasive conduct the sole proffered reason for his discharge, the court might agree with Plaintiff that the fact that

20

he alone was terminated for such behavior is suspicious.  However, as shown above, Defendant Tradesmen asserts several additional reasons for terminating Phillips.

Included amongst those additional reasons are the numerous complaints that Wettschurack received about Phillips' conduct.  Phillips challenges the significance of these complaints merely by pointing to testimony from other employees, such as Seeberg, Doerr, and Brodt, who did not have problems working with him.  Unfortunately, this testimony does not change the fact that several employees did have problems with Phillips – problems that apparently ran so deep that some felt the only way to improve the Cincinnati office was to get rid of Phillips.  Accordingly, Plaintiff fails to show that Defendant's reasons for terminating him were insufficient to warrant his discharge.

Phillips' case therefore turns on his ability to show that despite his abrasive behavior, his coworker's complaints about his conduct, and his alleged failure to hire competent employees, a question of fact remains as to whether Tradesmen's decision to terminate him was nevertheless based on his age.  The Court finds that the Phillips has met this burden.  Phillips, Moore, and Brodt related several instances in which Brophy made ageist comments suggesting that he intended to purge the company of its older employees.  For example, Brophy told Moore that in order to improve business in the Southern Ohio region, the company would need to "look at our most successful offices and the youth and exuberation.  There's a different feel to the offices. They're younger."  (Moore Dep. 68.)  In addition, Moore testified that Brophy instructed him to terminate four employees, including Phillips, because of their ages.  The testimony of employees Hillard and Doerr regarding their experiences with Brophy corroborates Moore's testimony.  In particular, the Court notes Brophy's comment to Hillard that "you're one of the old timers and,

21

you know, nobody can figure out why – how come you're still with the company." (Doc. 17 at 9;
Hillard Dep. 20-21.)

Even more detrimental to Defendant's case is Moore's testimony that Brophy instructed
him in particular to fire Phillips because Phillips was "old wood" and then ordered him to create
a documentation trail to support Phillips' termination.  Though there is reason to question
Moore's veracity, this question is reserved for the jury.[11]

Defendant correctly points out that Phillips presents no direct evidence that Brophy
instructed Wettschurack to terminate him.  Nonetheless, the evidence cited above is sufficient to
support an inference that Brophy either ordered Phillips' discharge or at the least influenced
Wettschurack's decision and that Phillips' discharge was part of a larger plan to infuse the
company with a younger workforce.

Viewing the facts in a light most favorable to Plaintiff as the Court must do at this time,
the Court finds that Plaintiff presents sufficient circumstantial evidence to suggest that his age
was the true motivating factor in his discharge.  Accordingly, the Court denies Defendant's
Motion for Summary Judgment as to Plaintiff's statutory age discrimination claims.

**C.      Public Policy Claim**

Defendant next argues that the Court should dismiss Phillips' public policy claim on the
basis that such a claim is no longer cognizable under Ohio law.  To succeed on a claim of
wrongful discharge in violation of public policy under Ohio law, a plaintiff must show that (1) a
"clear public policy existed and was manifested in a state or federal constitution, statute or

_____

[11] The Court notes, however, that the fact that Tradesmen provides no documentation of
any complaints regarding Phillips' performance corroborates Moore's testimony.  In fact,
Defendant's evidence is almost entirely in the form of deposition testimony and affidavits
created subsequent to Phillips' termination.

22

administrative regulation, or in the common law;" (2) that "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;" (3) "[t]he plaintiff's dismissal was motivated by conduct related to the public policy;" and (4) "[t]he employer lacked overriding legitimate business justification for the dismissal." *Parry v. Mohawk Motors of Michigan, Inc.,* 236 F.3d 299, 311 (6th Cir. 2000) (citing *Painter v. Graley*, 70 Ohio St. 3d 377, n. 8, 639 N.E.2d 51 (1994)).

Both the ADEA and Ohio Rev. Code §§ 4112.14 and 4112.99 are statutes evidencing a clear public policy against discharging an employee on the basis of the employee's age.  Thus, Phillips has satisfied the first prong of the analysis.  However, under the law of the Sixth Circuit and this District in particular, Phillips has not proved the second prong of the analysis, that Tradesmen's dismissing him under the circumstances jeopardized the public policy against age discrimination.  Under Ohio law, to prove the second prong of the public policy inquiry, a plaintiff must show that there is no other recourse or adequate remedy available to him:

> An analysis of the jeopardy element necessarily involves inquiring into the existence of any alternative means of promoting the particular public policy to be vindicated by a common-law wrongful-discharge claim.... Where, as here, the sole source of the public policy opposing the discharge is a statute that provides the substantive right and remedies for its breach, "the issue of adequacy of remedies" becomes a particularly important component of the jeopardy analysis....  Simply put, there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.

*Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 244, 773 N.E.2d 526 (2002) (internal citations omitted) (holding that a violation of the FMLA does not constitute a violation of Ohio public policy because the compensatory damages and equitable remedies afforded by the FMLA

23

provide a remedy adequate to protect the public policy embodied by the Act). The Sixth Circuit interpreted *Wiles* as barring a public policy claim for wrongful discharge if there is any other recourse available. *Carrasco v. NOAMTC Inc.*, No. 03-4229, 2004 WL 2756838, at *7 (6th Cir. Dec. 1, 2004) (holding that "[b]ecause [plaintiff] has a remedy available to him under both Title VII and [Ohio Revised Code Section 4112], we find that he cannot have that same claim under Ohio common law.")

The Ohio Supreme Court has not addressed whether Chapter 4112 provides a sufficient remedy such that it forecloses a public policy claim based on age discrimination. However, numerous courts in this Circuit have relied on *Carrasco* and *Wiles* to dismiss public policy claims in age discrimination suits. *See Feichtner v. Roman Catholic Archdiocese of Cincinnati*, No. 1:05-CV-00398, 2006 WL 571962 (S.D. Ohio March 7, 2006) (Spiegel, S.J.); *Williams v. Allstate Ins. Co.*, No. 5:04-CV-2435, 2005 WL 1315756 (N.D. Ohio June 2, 2005) (Nugent, J.); *Curry v. Consolidated Coal Co.*, No. C203-CV-1053, 2005 WL 1159410 (S.D. Ohio May 17, 2005) (Frost, J.). Additionally, courts that have not specifically cited *Carrasco* have still found that the type of public policy claim at issue here is foreclosed by the remedies in Chapter 4112. *See Gray v. Allstate Insurance Co.*, No. 1:03-CV-910, 2005 WL 2372845, (S.D. Ohio Sept. 26, 2005) (Beckwith, C.J.).

The Court is bound by the Sixth Circuit's holding in *Carrasco* and agrees with other courts in this Circuit that the broad scope of remedies available under Ohio Rev. Code Chapter 4112 is sufficient to vindicate Ohio's public policy against age discrimination and thus forecloses a separate cause of action for violation of public policy.

## IV. CONCLUSION

24

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.  (Doc. 14).  The Court grants summary judgment in favor of Defendant on Plaintiff's Ohio public policy claim but denies summary judgment as to Plaintiff's statutory age discrimination claims.

IT IS SO ORDERED.


___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge